IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTERO HOLLINGSWORTH,                )    No. 15 C 1595
                                     )
                Plaintiff,           )
                                     )
        vs.                          )    Chicago, Illinois
                                     )
ILLINOIS DEPARTMENT OF               )
CORRECTIONS, LOGAN CORRECTIONAL      )
CENTER, SHERIDAN CORRECTIONAL        )
CENTER, WEXFORD MEDICAL              )
CORPORATION, GAIL MAIONCHI, APN,     )
CATALINO BAUTISTA, M.D., and SALEH   )
OBAISI, M.D.,                        )
                                     )    March 22, 2017
                Defendants.          )    2:00 p.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HON. SARA L. ELLIS

APPEARANCES:

For the Plaintiff:        MR. NICOLAS ALBUKERK
                          Albukerk & Associates,
                          1450 West Randolph Street, Floor 2,
                          Chicago, Illinois  60607

For Defendants
Maionchi, Bautista,
Obaisi, and Wexford:      MR. TERRY S. LU
                          Cunningham, Meyer & Vedrine, P.C.,
                          One East Wacker Drive, Suite 2200,
                          Chicago, Illinois  60601

PATRICK J. MULLEN
Official Court Reporter
United States District Court
219 South Dearborn Street, Room 1412
Chicago, Illinois  60604

         1           THE CLERK:  2015 C 1595, Hollingsworth versus Illinois
         2    Department of Corrections.
         3           THE COURT:  All right.  I think you can all come
         4    forward.
02:19:26 5           MR. ALBUKERK:  Good morning, Judge -- or good
         6    afternoon.
         7           THE PLAINTIFF:  Good afternoon.
         8           MR. ALBUKERK:  Nic Albukerk for plaintiff,
         9    A-l-b-u-k-e-r-k.
02:19:40 10          THE COURT:  Mr. Hollingsworth?
        11           THE DEFENDANT:  Yes, ma'am.
        12           THE COURT:  All right.  Good afternoon.
        13           THE DEFENDANT:  Good afternoon.
        14           MR LU:  Good afternoon, Your Honor.  Terry Lu, L-u, on
02:19:47 15   behalf of the Wexford defendants.
        16           THE COURT:  All right.  So are we all squared away at
        17    this point with who's going when on all of the witnesses and
        18    all that?
        19           MR. LU:  I believe so, Your Honor.
02:19:58 20          THE COURT:  Okay.  Good.  All right.  Then do you want
        21    any argument first, or do you want to just get into the
        22    testimony?
        23        (Discussion off the record.)
        24           MR. LU:  We can go straight into the testimony.
02:20:16 25          THE COURT:  Okay.

1       MR. LU:  The Wexford defendants would call
2    Mr. Hollingsworth as the first witness.
3           THE COURT:  All right.
4           MR. ALBUKERK:  Judge, do you want to have him go up on
02:20:27  5  the stand there?
6           THE COURT:  I think that's probably easiest.
7           MR. ALBUKERK:  Okay, however you want to do it.
8           THE COURT:  So, Mr. Hollingsworth, if you want to come
9    around, when you get to the chair there, come on up and we'll
02:20:52 10  get you sworn in.
11          MR. ALBUKERK:  Can I roll this out of the way for a
12   second?
13          THE COURT:  Sure.  That's fine.
14      (Discussion off the record.)
15          THE COURT:  All right.  Pat, can you swear him in?
16      (Witness duly sworn.)
17               ARTERO HOLLINGSWORTH,
18            THE PLAINTIFF HEREIN, DULY SWORN,
19                 DIRECT EXAMINATION
20   BY MR. LU:
21   Q.  Good morning, Mr. Hollingsworth -- or afternoon.  Excuse
22   me.  Good afternoon, Mr. Hollingsworth.  My name is Terry Lu,
23   L-u.  I'm the attorney for the Wexford defendants in your case.
24   Can you please state and spell your name for the record?
02:21:34 25  A.  My name is Artero Hollingsworth.

1      THE REPORTER: Could you pull that thing closer to

2 you, sir, and go ahead?

3 BY THE WITNESS:

4 A. My name is Artero Hollingsworth, A-r-t-e-r-o,

02:21:44   5 Hollingsworth, H-o-l-l-i-n-g-s-w-o-r-t-h.

6 BY MR. LU:

7 Q. Okay. Mr. Hollingsworth, are you currently in IDOC

8 custody?

9 A. Yes, I am, sir.

02:21:54   10 Q. Okay. Where are you in custody?

11 A. Sheridan Correctional Center.

12 Q. Okay. Do you have an inmate number?

13 A. Yes, my inmate number is K52630.

14 Q. Okay. When did you first enter IDOC custody?

02:22:07   15 A. In 2011, October 2011.

16 Q. And were you at another facility before you were

17 transferred to Sheridan?

18 A. Yes. I was at Logan Correctional Center.

19 Q. Okay. Were you at another facility prior to Logan?

02:22:29   20 A. Stateville, which is called NRC. You're transferred from

21 there to Logan, to the penitentiary.

22 Q. Okay. Was Stateville the first IDOC facility that you were

23 taken into custody at?

24 A. Yes.

02:22:42   25 Q. And that was in 2011, you said?

1   A.   That was in 2011.

2   Q.   Okay.  Mr. Hollingsworth, we are here today for a lawsuit

3   you filed in the Northern District of Illinois regarding the

4   medical care you received at Logan Correctional Center.  Are

02:22:55   5   you familiar with that lawsuit?

6   A.   Yes.

7          THE COURT:  And, Mr. Lu, I believe we're covering both

8   the care that he received at Logan and Sheridan, is that

9   correct, or is the exhaustion limited to only the care he

02:23:06   10   received at Logan?

11          MR. LU:  It would cover of the care at Sheridan as

12   well.  I misspoke.

13          THE COURT:  Okay.

14   BY MR. LU:

02:23:12   15   Q.   You also referenced the care you received at Sheridan in

16   that lawsuit, Mr. Hollingsworth?

17   A.   Yes.

18   Q.   And were you the one who filed that lawsuit?

19   A.   Yes.

02:23:21   20   Q.   Would it be fair to characterize your lawsuit as a

21   complaint that your tongue cancer was misdiagnosed at Logan in

22   February of 2012?

23   A.   Could you repeat that, please?

24   Q.   Would it be fair to characterize your lawsuit as a

02:23:35   25   complaint that your tongue cancer was misdiagnosed at Logan

1   Correctional Center in February of 2012?

2   A.  Yes.

3   Q.  And also at Sheridan?

4   A.  Yes.

02:23:59   5          MR. LU:  Permission to approach, Your Honor?

6          THE COURT:  You may.

7   BY MR. LU:

8   Q.  Mr. Hollingsworth, I've handed you a document that I've

9   previously marked as Exhibit F.  Do you recognize this

02:24:13   10  document?

11  A.  Yes.

12  Q.  Okay.  What is it?

13  A.  It's from the United States District Court for the Northern

14  District of Illinois, Eastern Division.

02:24:24   15  Q.  Okay.  Do you recognize this document as the fourth amended

16  complaint filed in your lawsuit?

17  A.  Yes.

18          THE COURT:  Mr. Lu, do you have copies of the exhibits

19  for me?

02:24:38   20          MR. LU:  Sure.  I was going to enter it.

21  BY MR. LU:

22  Q.  And this document was prepared by your attorney, Nic

23  Albukerk?

24  A.  Yes.

02:24:48   25  Q.  Okay.  Do you dispute anything contained within this

1  document?

2  A.  No.

3       MR. LU:  Okay.  The Wexford defendants would move to

4  enter Exhibit F into evidence.

02:24:57  5       THE COURT:  Any objection?

6       MR. ALBUKERK:  No.

7       THE COURT:  It will be admitted.

8     (Wexford Defendants' Exhibit F received in evidence.)

9  BY MR. LU:

02:25:02  10  Q.  Mr. Hollingsworth, do you recall when you were first

11  diagnosed with tongue cancer?

12  A.  Pardon me?

13  Q.  Do you recall when you were first diagnosed with tongue

14  cancer?

02:25:11  15  A.  It was in November.

16  Q.  Okay.  Do you remember the year?

17  A.  2013.

18  Q.  Okay.  Would it be fair to say that you first became aware

19  in November 2013 that your tongue cancer was misdiagnosed?

02:25:24  20  A.  Not really.

21  Q.  Okay.

22  A.  No.

23  Q.  When did you first become aware then that your tongue

24  cancer was misdiagnosed at Logan and Sheridan?

02:25:34  25  A.  When I -- I really didn't know that it was really

1  misdiagnosed until February.

2  Q.  February of what year?

3  A.  2014.

4  Q.  Okay.  Can you turn to paragraph 29 of Exhibit F?

02:25:56  5  A.  Yes.

6  Q.  Can you read that paragraph for me?

7  A.  "The defendant Gail," that one?

8  Q.  Paragraph 29, it's on page 6.

9  A.  Oh, 29.

02:26:10  10  Q.  29, two-nine.

11  A.  Oh, I'm sorry.  I thought you said --

12      MR. ALBUKERK:  Judge, I'm going to object.  This is

13  not a sworn-to complaint by my client.  This is a writing of

14  his attorney.

02:26:22  15      MR. LU:  Plaintiff testified he doesn't dispute

16  anything contained within this document and that it was

17  prepared by his counsel.

18      THE COURT:  Overruled.  So, Mr. Hollingsworth, the

19  question was if you could read paragraph 29.

02:26:43  20  BY THE WITNESS:

21  A.  "On November 20, 2013, the results of the biopsy were

22  completed.  Dr. Caradine and a specialist informed

23  Mr. Hollingsworth that the lump was a squamous cell carcinoma,

24  which is a type of cancer."

02:27:01  25  Q.  Okay.  Mr. Hollingsworth, were you informed on November

1  20th, 2013, that you had been diagnosed with tongue cancer?

2  A.  Yes.

3  Q.  Did you know prior to that a date that you had tongue

4  cancer?

02:27:12  5  A.  No.

6      (Discussion off the record.)

7          MR. LU:  Permission to approach the witness?

8          THE COURT:  You may.

9  BY MR. LU:

02:27:48  10  Q.  Mr. Hollingsworth, do you recognize this document?  I've

11  handed you a document marked Exhibit D.  Do you recognize this

12  document?

13  A.  Yes.

14  Q.  Okay.  What is it?

02:27:56  15  A.  It says "Complainant's Answer to Pavey Request for

16  Admission to Propound by Defendant."

17  Q.  Okay.  Can you turn to page 4 of 4 for me?

18  A.  Page?

19  Q.  Exhibit D, page 4, the second to last page of this exhibit.

02:28:20  20  A.  Yes.

21  Q.  Do you recognize Nic Albukerk as your attorney?

22  A.  Yes.

23  Q.  And these are signed by your attorney?

24  A.  Yes.

02:28:29  25  Q.  Okay.  Do you dispute any of the responses contained in

1  this document?

2  A.  May I read them?

3  Q.  I'm sorry.  Can you repeat that answer?

4  A.  May I read them?

02:28:45  5  Q.  Sure.

6  A.  Yes.

7  Q.  "Yes" being?

8  A.  I've read this.

9  Q.  Okay.  Do you dispute any of the responses contained in

02:29:09  10  that document?

11  A.  No.

12       MR. LU:  Okay.  The Wexford defendants would move

13  Exhibit D into evidence.

14       THE COURT:  Any objection?

02:29:19  15       MR. ALBUKERK:  No.

16       THE COURT:  It will be entered.

17     (Wexford Defendants' Exhibit D received in evidence.)

18       MR. LU:  Permission to approach the witness?

19       THE COURT:  You may.

02:29:31  20  BY MR. LU:

21  Q.  Mr. Hollingsworth, I've handed you what's been previously

22  marked as Exhibit B.  Do you recognize these documents?

23  A.  These are my handwritings, yes.

24  Q.  Okay.  Have you seen these documents before?

02:30:46  25  A.  I must have seen them because my signature is on them.

1    Q.  Okay.  Do you recall what they are?

2    A.  It says something about "offender's handbook orientation

3    receipt."

4    Q.  All right.  Is it your testimony that your signature

02:31:00    5    appears on all three pages?

6    A.  Yes, sir.

7    Q.  Okay.  Looking at the first page of Exhibit B, is that your

8    signature above the line labeled "offender signature"?

9    A.  Yes.

02:31:12    10    Q.  And can you read the date next to that signature?

11    A.  9/27.  I don't see -- there's not a date up under after the

12    27th on my signature.

13    Q.  Okay.  Do you recall looking at this document where this

14    document was created?

02:31:29    15    A.  No.  I see it says up here "Stateville," but I don't really

16    recall that.

17    Q.  Okay.  The handwritten "Stateville," is that your

18    handwriting?

19    A.  That's my handwriting.

02:31:42    20    Q.  Okay.  Do you dispute that this document was created at

21    Stateville?

22    A.  No, I don't dispute that it's done at Stateville.  I know

23    this is my signature.

24    Q.  Okay.  Turning to the second page, is this your signature

02:31:54    25    above the line labeled "offender signature"?

1  A.  Yes.

2  Q.  Okay.  What is the date next to that signature?

3  A.  10/17/11.

4  Q.  Okay.  Do you recall where this document was created?

02:32:03  5  A.  No, but it says "Logan."  This is my signature, so I must

6  have signed it.

7  Q.  Okay.  Do you dispute that this document was created at

8  Logan?

9  A.  No.

02:32:12  10  Q.  Turning to the last page of Exhibit B, is this your

11  signature above the line "offender's signature"?

12  A.  Yes.

13  Q.  Okay.  What is the date next to that?

14  A.  8/1/12.

02:32:23  15  Q.  Okay.  Do you recall where this document was created?

16  A.  At Sheridan.

17  Q.  Okay.  Mr. Hollingsworth, did you go through an orientation

18  when you first arrived at Stateville?

19  A.  They gave us some paperwork, yeah, but I don't think that

02:32:45  20  they really gave us too many rules and regulations at that

21  particular time.

22  Q.  But you recognize that as an orientation?

23  A.  "Orientation receipt," it says, yes.

24  Q.  Okay.  Did you go through an orientation when you first

02:32:57  25  arrived at Logan?

1    A.  Yes.

2    Q.  Okay.  Did you go through an orientation when you first

3    arrived at Sheridan?

4    A.  Yes.

02:33:03    5    Q.  Okay.  Do you recall what was discussed at each

6    orientation?

7    A.  What was discussed at Logan, I don't.  I can't really

8    recall.  What was discussed at Sheridan, it was just a couple

9    of pieces of paper that we had to sign.  I don't remember any

02:33:22    10   rules or regulations or anything like that that was given to

11   us.  It was just paperwork that we had to sign stating that we

12   was in the orientation.

13   Q.  Okay.  Do you recall if a grievance procedure was discussed

14   at any of the orientations?

02:33:41    15   A.  No.

16   Q.  Is that no, you don't recall --

17   A.  I don't.

18   Q.  -- or no, it was not discussed?

19   A.  I don't recall.

02:33:47    20   Q.  Okay.  Did you receive an offender handbook at each

21   facility?

22   A.  No.

23   Q.  Have you ever read the offender handbook?

24   A.  No.

02:33:57    25   Q.  Okay.  Do you know what is contained in the offender

1  handbook?

2  A.  Not really, no.

3  Q.  Mr. Hollingsworth, is there a grievance procedure available

4  to inmates within the Illinois Department of Corrections?

02:34:09  5  A.  A grievance procedure?

6  Q.  Yes.

7  A.  As far as the paperwork you can file a grievance on?

8  Q.  Correct.

9  A.  Yes.

02:34:16  10  Q.  Okay.  And what is your understanding of the purpose of

11  that procedure?

12  A.  For complaints, if you have a complaint that's not being

13  took care of, then you file a grievance.

14  Q.  Okay.  Are you aware that there is a procedure for

02:34:34  15  appealing grievance responses?

16  A.  No.

17  Q.  Have you ever submitted a grievance?

18  A.  Yes.

19  Q.  Okay.  Have you ever appealed a grievance response?

02:34:42  20  A.  On this particular case.

21  Q.  You have appealed.

22  A.  Well, I filed a grievance on this particular case.

23  Q.  Okay.  Do you recall if you appealed the grievance

24  response?

02:34:53  25  A.  I'm sure if I ended up filing a grievance that you have to.

1   It comes back as that you have to appeal it if they deny it,

2   correct.

3   Q.  Okay.  And do you recall if you appealed your grievance to

4   the Administrative Review Board in Springfield?

02:35:12   5   A.  I think so, yes.

6   Q.  Okay.  Are you aware of any deadlines for the initial

7   filings of a grievance?

8   A.  No, sir.

9       MR. LU:  The Wexford defendants would move to enter

02:35:34   10   Exhibit B into evidence.

11       THE COURT:  Any objection?

12       MR. ALBUKERK:  Which one is B?

13       THE COURT:  The offender orientation receipts.

14       MR. ALBUKERK:  Oh, no, no objection.

02:35:43   15       THE COURT:  All right.  Those will be admitted.

16      (Wexford Defendants' Exhibit B received in evidence.)

17       MR. LU:  Permission to approach the witness?

18       THE COURT:  You may.

19   BY MR. LU:

02:36:04   20   Q.  Mr. Hollingsworth, I've handed you what I previously marked

21   as Exhibit A.  Can you flip through that for me, and do you

22   recognize the documents contained within in this exhibit?

23   A.  Yes.

24   Q.  Okay.  What are these documents?

02:37:29   25   A.  Some of the grievances that I filed.

1  Q.  Can you turn to page 10 for me?

2  A.  Yes.

3  Q.  Do you recognize this document?

4  A.  Yes.

02:37:55  5  Q.  Okay.  What is this document?

6  A.  It's a grievance that I filed in February -- I mean, for

7  Logan in Sheridan.  I filed this in Sheridan.

8  Q.  Okay.  But page 10 is a grievance?

9  A.  Yes.

02:38:12  10  Q.  That you filed?

11  A.  Yes.

12  Q.  Okay.  It's actually two pages covering pages 10 and 11?

13  A.  Yes.

14  Q.  Okay.  When did you submit this grievance,

02:38:25  15  Mr. Hollingsworth?

16  A.  The date is 2/26/2014.

17  Q.  Okay.  I believe you stated you submitted this while you

18  were at Sheridan?

19  A.  Yes.

02:38:35  20  Q.  Okay.  What did you write under "nature of grievance"?

21  A.  You want me to read it?

22  Q.  If you look here, the top section is labeled "nature of

23  grievance."  Do you see that?

24  A.  Yes.

02:38:49  25  Q.  Okay.  Then did you write something next to "other"?

1  A.  "Misdiagnosis," yeah.  Okay.  Yes.

2  Q.  Would it be fair to characterize this grievance as a

3  grievance regarding the alleged misdiagnosis of your tongue

4  cancer?

5  A.  Yes.

6  Q.  Is that your signature near the middle, above the line

7  labeled "offender signature"?

8  A.  Yes.

9  Q.  And this is your handwriting in the top half of the first

10 page and the entire second page of this grievance?

11 A.  Yes.

12 Q.  Okay.  Did you receive a counselor's response to this

13 grievance?

14 A.  I believe so.

15 Q.  Okay.  Is that reflected in the box in the second half of

16 the page of page 10?

17 A.  Yes, it's a counselor's response.

18 Q.  Okay.  Did you appeal the counselor response?

19 A.  I'm not sure.  I think I did.  I'm not sure.

20 Q.  Okay.  Can you turn to page 9 for me?

21 A.  9?  Okay.  Yes.

22 Q.  Do you recognize this document?

23 A.  Yes.

24 Q.  What is it?

25 A.  It's the grievance officer's report.

1  Q.  Okay.  Is it the grievance officer's report that was

2  prepared in response to the grievance on pages 10 and 11?

3  A.  It says "appeal to director" at the bottom of the page.

4  Q.  Okay.  Is that your signature near the bottom, sir, above

02:40:38   5  the line marked "offender signature"?

6  A.  Yes, it is.

7  Q.  Do you recall when you received the grievance officer's

8  response?

9  A.  No, I don't.  I don't recall when I received it back, no,

02:40:51  10  sir.

11  Q.  Okay.  Do you recall when you appealed this grievance to

12  the director?

13  A.  It says here.  On the same page here?

14  Q.  Uh-huh.

02:41:03  15  A.  It says 4/23/14, correct.

16  Q.  Is that in the box marked "chief administrative officer's

17  response"?

18  A.  It says "date received 4/23/14."

19  Q.  I'm not sure where you are, which date you're referring to

02:41:25  20  there, Mr. Hollingsworth.  Can you describe what area of the

21  page?

22         THE COURT:  I think, Mr. Hollingsworth, actually look

23  at the bottom of the page.

24         THE WITNESS:  Yeah.  It says 5/1/14, if that's what

02:41:32  25  you mean.

BY MR. LU:

Q.   Okay.  That's the date that you appealed this grievance response to the director?

A.   Uh-huh.

02:41:43   Q.   Okay.  Do you recall if you received a response from the Administrative Review Board, Mr. Hollingsworth?

A.   I'm not sure if I did or not.  Do you have any copies in here showing me that I did?

Q.   I'm just asking if you recall, Mr. Hollingsworth.

02:41:55   A.   I don't recall.

         MR. LU:  Okay.  The Wexford defendants would move to enter Exhibit A into evidence.

         THE COURT:  Any objection?

         MR. ALBUKERK:  No.

02:42:08          THE COURT:  All right.  That will be admitted.

      (Wexford Defendants' Exhibit A received in evidence.)

         MR. LU:  No further questions, Your Honor.

         THE COURT:  All right, Mr. Albukerk.

                     CROSS-EXAMINATION

02:42:22   BY MR. ALBUKERK:

Q.   Mr. Hollingsworth, when you were diagnosed with cancer in November 2013, did you have any complaint about Dr. Caradine finding the cancer and saving your life?

A.   I was gracious that he found it.

02:42:56   Q.   Now, Dr. Caradine and the specialist are the ones who found

1  the cancer in November of 2013.

2  A.  Correct.

3  Q.  Now, Dr. Caradine is a dentist, right?

4  A.  Yes.

02:43:12  5  Q.  Did you regularly see this dentist while you were at

6  Sheridan?

7  A.  No.

8  Q.  All right.  Which doctor did you normally see when you were

9  at Sheridan?

02:43:20  10  A.  Dr. Bautista.

11  Q.  All right.  When you were at Logan, you regularly saw a

12  doctor?

13  A.  Obaisi.

14  Q.  All right.  When you were informed that you had the cancer,

02:43:36  15  was this at Sheridan or was this at University of Illinois

16  Hospital?

17  A.  This was at Sheridan.

18  Q.  All right.  Now, once the cancer was discovered, were you

19  eventually taken to the University of Illinois?

02:43:51  20  A.  Yes.

21  Q.  All right.  Were you treated at the University of Illinois?

22  A.  Yes.

23  Q.  When did you find out that the previous complaints about

24  mouth sores and tongue sores that you had had were related to

02:44:07  25  the cancer?

1  A.  In February, when I went back for my checkup after they did

2  the surgery.

3  Q.  So that was February of 2014?

4  A.  Yes, February 2014, right.

02:44:21    5  Q.  And you filed your grievance in February of 2014?

6  A.  Yes.

7  Q.  Now, the room where you saw Dr. Caradine at Sheridan when

8  they informed you of the cancer, this is the same area that

9  Dr. Bautista works in, right?

02:44:45   10  A.  Yes, it's in the same area.  It's in the same hospital.

11  Q.  It's like an infirmary, right?

12  A.  Yes.

13  Q.  At Sheridan.

14  A.  Yes.

02:44:53   15  Q.  So at no time did Dr. Caradine or the specialist at

16  Sheridan immediately point the finger at Dr. Bautista for not

17  properly treating your mouth sores.

18  A.  No.

19          MR. ALBUKERK:  Nothing further.

02:45:29   20          THE COURT:  I just have a couple questions.  So,

21  Mr. Hollingsworth, what did the dentist, Dr. Caradine, tell you

22  in November of 2013?

23          THE WITNESS:  I went to get my teeth pulled, and he

24  saw the lump.  He asked me if I was having a problem with it,

02:45:55   25  and I said yes.  So he said:  Well, do you know what?  I have a

1  specialist coming next week that I'm going to have take a look
2  at that.

3          Then I said okay.  The next week, Dr. Craig, which is
4  the specialist, came and did a biopsy on my tongue.  The next
02:46:12  5  week, the results had came back, and they called me back to th
6  dentist's office.  Then that's when they gave me the news that
7  it was squamous carcinoma cancer.

8          THE COURT:  Okay.  Then what happened in February of
9  2014 at the University of Chicago -- or the University of
02:46:31  10  Illinois?  Who were you with at that time?

11          THE WITNESS:  They sent me to the university, UIC, and
12  they did the surgery on my mouth.  After they did the surgery,
13  I stayed in the hospital a little while.  Then they sent me
14  back.  Then when I came back for my checkup in February is when
02:46:52  15  the doctors are around and tell you, and I overheard the
16  doctors say that it could have been probably avoided if it had
17  been caught earlier.

18          THE COURT:  Okay.  Did anybody say to you directly
19  that the mouth sores that you had been experiencing were what
02:47:10  20  led to the cancer?

21          THE WITNESS:  Yes, ma'am.

22          THE COURT:  Okay.  Who was it that said that to you?
23          THE WITNESS:  I'm not sure which one of the doctors it
24  was, because in UIC you have a variety of doctors that's around
02:47:23  25  you.  It was one of the doctors that had mentioned that.

1    That's what made me file the grievance.

2         THE COURT:  Okay.  Prior to this time, had you

3    connected the mouth sores that you were having with the

4    diagnosis of tongue cancer?

02:47:39   5         THE WITNESS:  No, ma'am.

6         THE COURT:  All right.  That's all I have.

7         Mr. Lu or Mr. Albukerk?

8         MR. ALBUKERK:  Nothing based on that.

9                   REDIRECT EXAMINATION

02:47:48   10   BY MR. LU:

11   Q.  Mr. Hollingsworth, was the location of your tongue cancer

12   in the same location as the tongue sores you experienced

13   earlier?

14   A.  It was on the same side that I had got my tooth pulled on,

02:48:08   15   yes, sir.  It was on this side (indicating).

16   Q.  Okay.  Approximately the same location?

17   A.  Yes.

18        THE COURT:  All right.  Anything further, Mr. Lu?

19        MR. LU:  Nothing further.

02:48:29   20        THE COURT:  Okay.

21        MR. ALBUKERK:  Nothing further.

22        THE COURT:  Mr. Hollingsworth, tell me your -- what's

23   your educational background?

24        THE WITNESS:  I have a 12th grade.  I went to the 12th

02:48:41   25   grade.

1    THE COURT:  Okay.  Did you graduate from high school?

2    THE DEFENDANT:  No.

3    THE COURT:  Did you get a GED?

4    THE WITNESS:  I didn't graduate from high school.

02:48:45    5    THE COURT:  Okay.

6    THE WITNESS:  But I did go to college and take a

7 business course, Introduction to Business.

8    THE COURT:  And did you ever get your GED?

9    THE WITNESS:  No, ma'am.

02:48:57    10    THE COURT:  Okay.  So you don't have a GED and you're

11 not a high school graduate, is that correct?

12    THE DEFENDANT:  No, ma'am, I'm not.

13    THE COURT:  Okay.  Have you ever worked in the science

14 or medical field at all?

02:49:07    15    THE DEFENDANT:  No, ma'am.  No, ma'am.

16    THE COURT:  All right.  Anything further?

17    MR. LU:  Nothing further, Your Honor.

18    MR. ALBUKERK:  No.

19    THE COURT:  All right, Mr. Hollingsworth.  You can

02:49:20    20 step down, and we'll call our next witness.

21    (Witness excused.)

22    MR. ALBUKERK:  Well, I'd like to have him here still

23 if that's okay.

24    MR. LU:  The Wexford defendants call Leslie McCarty as

02:49:43    25 the next witness.

1    THE COURT:  All right.

2        (Brief pause.)

3        THE CLERK:  Ms. McCarty, can you hear us?

4        THE WITNESS:  (Via teleconference) Yes, I can.

02:49:55   5    MR. LU:  Do you mind if I turn this (indicating)?

6        MR. ALBUKERK:  Yeah, please.  Go right ahead.  I'm

7    sorry about that.  Do you need some help?

8        (Discussion off the record.)

9        THE REPORTER:  Would you please raise your right hand?

02:50:03  10    (Witness duly sworn.)

11                        LESLIE McCARTY,

12              DEFENDANTS' WITNESS, DULY SWORN,

13                     DIRECT EXAMINATION

14   BY MR. LU:

02:50:45  15   Q.  Good afternoon, Ms. McCarty.  My name is Terry Lu.  I'm an

16   attorney for the Wexford defendants in this case.  Can you

17   please state your name for the record?

18   A.  Leslie McCarty.

19   Q.  And can you spell that for me?

02:50:57  20        THE COURT:  Before we get started, Ms. McCarty, it's

21   Judge Ellis.  I just want to thank you for your patience.

22   Apparently, with the switch around in the order, it sent the

23   technology completely out of whack.  So we had to drop

24   everybody and reschedule everybody.  So I appreciate your

02:51:15  25   patience.  Thank you.

1    THE WITNESS:  Okay.

2  BY MR. LU:

3  Q.  Ms. McCarty, can you spell your name, please?

4  A.  Yes, Leslie, L-e-s-l-i-e, McCarty, M-c-C-a-r-t-y.

02:51:33  5  Q.  Okay.  Ms. McCarty, are you currently employed?

6  A.  Yes, I am.

7  Q.  Okay.  Who is your employer?

8  A.  State of Illinois, Department of Corrections.

9  Q.  Okay.  Where do you work?

02:51:48  10  A.  I work in the Administrative Review Board/Inmate Issues

11  Unit.

12  Q.  Okay.  Is that in Springfield?

13  A.  Yes, it is.

14  Q.  Okay.  What is your job title?

02:52:02  15  A.  I am a public service administrator, and I am the manager

16  of the ARB.

17  Q.  Okay.  What is the ARB?

18  A.  Administrative Review Board.

19  Q.  Okay.  And what are your responsibilities?

02:52:20  20  A.  I review -- well, me and my staff, we review grievances,

21  protective custody hearings, restoration/revocation of time for

22  offenders.

23  Q.  Okay.  In your position, are you also known as an ARB

24  chairperson?

02:52:46  25  A.  I was an ARB chairperson.

1    Q.  Oh, I see.

2    A.  I'm now the manager of the unit, yes.

3    Q.  Okay.  How long have you been with the ARB?

4    A.  Since September 2013.

02:52:59    5    Q.  As an ARB -- as someone with the ARB, are you familiar with

6    the grievance process available to IDOC inmates?

7    A.  Yes, I am.

8    Q.  Okay.  Are you familiar with the deadlines that are part of

9    that grievance process?

02:53:17    10    A.  Yes.

11    Q.  Okay.  Leslie, take a look at the document that's marked

12    Exhibit E in front of you.

13    A.  Okay.

14    Q.  Do you have that?

02:53:59    15    A.  Yes, I do.

16    Q.  Do you recognize this document?

17    A.  Yes.

18    Q.  What is it?

19    A.  It's the grievance procedures for offenders.

02:54:09    20    Q.  And is that for offenders in the state of Illinois?

21    A.  Yes.

22    Q.  And this is something that is contained within the Illinois

23    Administrative Code?

24    A.  Yes.

02:54:26    25    Q.  Okay.  Do you know if the Illinois Administrative Code is

1    readily available to the public?

2    A.  Yes, I believe it is.

3    Q.  And was it your testimony that this section of the

4    Administrative Code describes the grievance procedures for

02:54:49    5    offenders in Illinois?

6    A.  Yes, it does.

7    Q.  Can you generally describe for me the steps in the

8    grievance process?

9    A.  An offender, when he has an issue, should try to first

02:55:09    10   resolve it with his counselor.  If not, he needs to file a

11   grievance.  He or she needs to file a grievance within 60 days

12   of the occurrence or when he's made aware, file a grievance

13   through the counselor.  If it can't be resolved through the

14   counselor, it goes to the grievance officer.  After the

02:55:33    15   grievance officer's review and the warden signs off and does

16   their review, if the offender still is not happy, he can appeal

17   it through the ARB/Inmate Issues.

18   Q.  Okay.  With the 60 days that you mentioned, what triggers

19   the clock on those 60 days?

02:55:59    20   A.  The offender needs to provide a date in the grievance of

21   when the occurrence happened, the denial, so that we have a

22   time frame established that we can work off of.

23   Q.  Okay.  The 60 days is the initial deadline for filing a

24   grievance?

02:56:16    25   A.  Yes, it is.

1    Q.  Okay.  Has an inmate complied with these procedures if he

2    files a grievance beyond that initial 60-day deadline?

3    A.  Unless the offender can give a reason why it should be

4    reconsidered, if he has filed with no justification, then it

02:56:45    5    would be deemed untimely.

6    Q.  Okay.  If an inmate has submitted a grievance untimely, is

7    that effective for exhausting administrative remedies?

8    A.  No, the offender has not exhausted.

9    Q.  Okay.  Does this section of the Illinois Administrative

02:57:07    10    Code apply to inmates in all IDOC facilities?

11    A.  Yes.

12        MR. LU:  The Wexford defendants would move to enter

13    Exhibit E into evidence.

14        THE COURT:  Any objection?

02:57:21    15        MR. ALBUKERK:  No objection.

16        THE COURT:  All right.

17    (Wexford Defendants' Exhibit E received in evidence.)

18    BY MR. LU:

19    Q.  Ms. McCarty, I'd like to direct your attention to what's

02:57:32    20    been marked Exhibit A.

21    A.  Yes.

22    Q.  Do you have that in front of you?

23    A.  Yes, I do.

24    Q.  Okay.  Do you recognize this document?

02:57:42    25    A.  Yes.

1   Q.  Okay.  What is it?

2   A.  Well, the whole document is an I-Grieve sheet that lists

3   the grievances that the offender has filed and some of the

4   attaching -- attached grievances that our office has responded

02:58:07   5   to.

6   Q.  Okay.  All of the documents contained within Exhibit A, are

7   they all related to a single offender?

8   A.  Yes.

9   Q.  And who is that offender?

02:58:23   10  A.  Hollingsworth.

11  Q.  Okay.  First name?

12  A.  Artero.

13  Q.  Okay.

14  A.  I'm not sure how you pronounce it.

02:58:38   15  Q.  Sure.  Can you turn to page 2 of Exhibit A for me?

16  A.  Yes.

17  Q.  Do you recognize this document?

18  A.  Yes, I do.

19  Q.  And what is it?

02:58:54   20  A.  It is a certification of custodian.

21  Q.  Okay.  Is this your signature on page 2?

22  A.  Yes, it is.

23  Q.  Okay.  Then what is the date that you signed this on?

24  A.  September 20th, 2016.

02:59:15   25  Q.  And did you understand this page as your attestation that

1    these are the documents that were contained in

2    Mr. Hollingsworth's ARB file?

3    A.  Yes.

4    Q.  Okay.  Complete as of the date you signed this?

02:59:39    5    A.  Correct.

6    Q.  Okay.

7    A.  Yes.

8    Q.  Please turn to page 8 for me.

9    A.  Okay.

03:00:02    10    Q.  Do you recognize this document?

11    A.  Yes, I do.

12    Q.  What is it?

13    A.  It is a DOC-0070.  It's the Administrative Review Board

14    return of grievance or correspondence.

03:00:17    15    Q.  Okay.  What is the purpose of this type of document?

16    A.  To give the offender a notification as to why the grievance

17    isn't being reviewed.

18    Q.  Okay.

19    A.  And there's different sections.

03:00:34    20    Q.  Okay.  Is this your handwriting on this page?

21    A.  Yes, it is.

22    Q.  And was this form returned to the inmate, Artero

23    Hollingsworth?

24    A.  Yes.

03:00:51    25    Q.  Was this form prepared in response to the grievance found

1 on pages 9 through 11?

2 A. Yes, it was.

3 Q. And why was this form returned to Mr. Hollingsworth?

4 A. Well, when I reviewed the grievance that is dated 2/26/14,

03:01:24 5 within the contents of the grievance offender talks about some

6 medical issues that he had in February of 2012, which makes the

7 grievance -- the issue is over 60 days old, so it wasn't filed

8 timely.

9 Q. Okay. Was it your understanding that this grievance --

03:01:54 10 well, why did you identify the February 2012 date as the

11 relevant date?

12 A. Because that's what's provided in the grievance, and within

13 the grievance there's not another date that the offender

14 provided that I could look at to do a review on.

03:02:20 15 Q. Do you recall if Mr. Hollingsworth provided any reason for

16 filing the grievance untimely?

17 A. I'm not aware of any information that he provided in

18 support of why it was filed untimely.

19 Q. Okay. If Mr. Hollingsworth did provide that information,

03:02:48 20 would it be contained within his ARB file?

21 A. Yes, it would.

22 Q. Okay. Have you looked through Exhibit A in its entirety?

23 A. Yes.

24 Q. Okay. Did you note any indication given by

03:03:08 25 Mr. Hollingsworth as to why this grievance was filed untimely?

1  A.  There's no additional information as to why it's filed

2  untimely, right.

3  Q.  Okay.  When did you provide this return of grievance form

4  to Mr. Hollingsworth?

03:03:26  5  A.  On August 22nd, 2014.

6          MR. LU:  Okay.  Thank you.  No further questions.

7          THE COURT:  Mr. Albukerk?

8                  CROSS-EXAMINATION

9  BY MR. ALBUKERK:

03:03:59  10  Q.  Ma'am, did you ever meet Mr. Artero Hollingsworth?

11  A.  No, I never have.

12  Q.  Do you know if his counselor ever talked to him?

13  A.  I'm not aware of that, no.

14          MR. ALBUKERK:  Nothing further.

03:04:25  15          THE COURT:  Ms. McCarty, it's Judge Ellis.  You had

16  said earlier that the 60-day clock starts basically when the

17  offender is made aware of the issue, is that right?

18          THE WITNESS:  Correct, yes.

19          THE COURT:  Okay.  Basically, the ARB is the end of

03:04:54  20  the line, is that right?  You can't appeal from an ARB decision

21  denying a grievance?

22          THE WITNESS:  That's correct.

23          THE COURT:  Okay.  Mr. Hollingsworth filed a grievance

24  and then appealed it all the way up to the ARB, is that right?

03:05:12  25          THE WITNESS:  Yes, it is.

1     THE COURT:  Okay.  Other than the timing issue with

2 filing the grievance, going through the appeal process, he was

3 timely otherwise, is that correct?

4     THE WITNESS:  Well, no, not really.  If you look at

03:05:42   5 the grievance, what the grievance officer provided, just by

6 what the grievance officer provided it looks like the offender

7 was made aware of -- complaining of his diagnosis as of

8 November 2013.  But the offender didn't file the grievance

9 until February 26, 2014, and that also is 60 days past the time

03:06:08  10 frame.

11     THE COURT:  Well, that wasn't my question.  My

12 question was:  After he filed the initial grievance, so putting

13 that to the side and going through the appellate process, he

14 was timely, is that right?

03:06:29  15     THE WITNESS:  Well, once again, maybe I don't

16 understand.  He really wasn't timely even in that process

17 because he was made aware of his -- per the grievance officer,

18 his tongue issue or medical issue as of November 2013.

19     THE COURT:  But that wasn't my question.  That's not

03:06:54  20 my question.  All right?

21     THE WITNESS:  Okay.

22     THE COURT:  So I'm not talking about the date by which

23 he actually filed the grievance.  Once he got a response back

24 from his grievance and then went up to the ARB, those responses

03:07:11  25 from him were timely, is that right?

1          THE WITNESS:  Yes, the response, the ARB received his

2    response timely.

3          THE COURT:  Okay.  Looking at the report, the

4    grievance officer basically says that having reviewed his

03:07:49    5    medical records, the basis for the denial was that the medical

6    records didn't substantiate the report of having complained of

7    mouth sores in February of 2012 and that at no time throughout

8    his medical treatment was there documentation of mouth sores or

9    his complaints until he was diagnosed in November of 2013.  I'm

03:08:16   10    looking at page 9.

11          THE WITNESS:  Yes.

12          THE COURT:  Okay.  Then he appealed that.  Then it

13    eventually went up to you, and you denied it saying that the

14    initial grievance was untimely because he was complaining of

03:08:46   15    not being treated in February 2012 for mouth sores.  Had that

16    simply been the case, then, yes, his grievance would have been

17    filed two years later, which is, you know, significantly past

18    that 60-day date.  In looking at --

19          THE WITNESS:  Yes.

03:09:18   20          THE COURT:  In looking at the narrative of his

21    grievance, he does discuss it.  He starts out by saying in

22    February of 2012 that he was complaining about bumps in his

23    mouth, that he continued to complain to Mr. Obaisi -- or to

24    Dr. Obaisi.  Then he complained to Dr. Pauticia, who we now

03:09:49   25    know as Dr. Bautista.  Then he finally went to the dentist to

1    have a tooth removed.  Dr. Caradine looked at the lump, and

2    then Dr. Craig biopsied it.  Then after he went to the

3    follow-up, he was told that he had cancer.

4         Then he discusses what his treatment was, that he had

03:10:22    5    20 percent of his tongue removed and a permanent scar and

6    disfigurement, and he's saying that it took 26 months for him

7    to receive treatment from his initial complaint.

8         So could it be then that he was complaining?  Could it

9    be fairly read that he was complaining of not receiving

03:10:55   10    treatments at the very least through November of 2013?

11         THE WITNESS:  Well, he could have, yes.  He could

12    have, but he is responsible for providing dates as to maybe the

13    last time he was seen by the doctors so that we would have a

14    starting point to go from.

03:11:19   15         THE COURT:  Okay.  Once he received your response from

16    the ARB, he could not go any further, is that right?

17         THE WITNESS:  Correct, he could not appeal our

18    decision.

19         THE COURT:  Okay.  All right.  Mr. Lu or Mr. Albukerk,

03:11:41   20    anything further?

21         MR. ALBUKERK:  No, Your Honor.

22                     REDIRECT EXAMINATION

23    BY MR. LU:

24    Q.  Ms. McCarty, do you rely upon an inmate's characterization

03:11:52   25    of the grievance as listed under "nature of grievance" in

1  reading those grievances?

2  A.  I'm sorry.  Could you further explain that question?

3  Q.  Sure.  In interpreting the subject matter of a grievance,

4  do you ever rely upon what is marked by the inmate under

03:12:11   5  "nature of grievance"?

6  A.  Yes.

7  Q.  Okay.  Is Mr. Hollingsworth's grievance marked in any way

8  under "nature of grievance"?

9  A.  "Misdiagnosis."

03:12:31   10  Q.  Okay.  Would that inform how you read it, how you read this

11  grievance?

12  A.  Yes, that it's that he had a medical misdiagnosis of cancer

13  of the tongue after reading the grievance.

14  Q.  Okay.  According to your reading of this grievance, when

03:12:56   15  did that misdiagnosis occur?

16  A.  In February of 2012.

17          MR. LU:  Thank you.  Nothing further.

18          THE COURT:  Ms. McCarty, if you had any additional

19  questions or wanted additional information, is it your practice

03:13:16   20  or the practice of the IDOC to request additional information

21  from an offender?

22          THE WITNESS:  Yes, we can do that.

23          THE COURT:  Okay.  Did you do that in this case?

24          THE WITNESS:  No, I did not.

03:13:35   25          THE COURT:  Okay.  If you don't request additional

1   information, is the offender -- after you make your decision,

2   the offender doesn't have the ability to appeal your decision

3   or to provide additional information, is that correct?

4              THE WITNESS:  Correct.

03:13:57   5              THE COURT:  Okay.  Anything further?

6              MR. LU:  One more?

7              THE COURT:  Sure.  Go ahead.

8                        REDIRECT EXAMINATION

9   BY MR. LU:

03:14:07   10   Q.  Ms. McCarty, do you ever examine the grievance officer's

11   report in deciding how to rule upon a grievance?

12   A.  Yes, I do.

13   Q.  Okay.  So you would have had access to the information

14   contained on page 9 in determining how to handle this

03:14:34   15   grievance?

16   A.  Yes.

17   Q.  And that would include what you referenced earlier, that

18   according to this there had been a cancer diagnosis in November

19   of 2013?

03:14:48   20   A.  Yes.

21   Q.  Okay.  To the extent that November of 2013 is a relevant

22   date, this grievance would still have been deemed untimely?

23   A.  Correct, yes.

24              MR. LU:  Thank you.

03:15:04   25              THE COURT:  Ms. McCarty, if the offender were to say

1  that no one connected the sores in his mouth or the bumps on

2  his tongue with the subsequent diagnosis of tongue cancer until

3  February of 2014, would you find that the grievance was timely

4  filed if that was the date that he was made aware?

03:15:36   5      THE WITNESS:  If he would have provided that in the

6  grievance, then yes.

7      THE COURT:  Okay.  To be clear, you didn't deny the

8  grievance because of the November 2013 date.  You denied it

9  from the February 2012 date.

03:16:00  10      THE WITNESS:  Correct.

11      THE COURT:  All right.  Anything further?

12      MR. ALBUKERK:  No.

13      THE COURT:  All right.  Thank you, Ms. McCarty.  I

14  appreciate all your patience.

03:16:12  15      THE WITNESS:  Okay.  Thank you.

16      (Witness excused.)

17      MR. LU:  Your Honor, which exhibits have been entered

18  into evidence?

19      THE COURT:  So I've got F, D, B, A, and E.  So all

03:20:16  20  that's missing is C if you've got one.

21      MR. LU:  Okay.

22      (Discussion off the record.)

23      THE REPORTER:  Sir, can you hear me?

24      THE WITNESS:  (Via teleconference) Yes, sir.

25      THE REPORTER:  Please raise your right hand to be

1  sworn.

2     (Witness duly sworn.)

3                    SCOTT LAWRY,

4            DEFENDANTS' WITNESS, DULY SWORN,

03:20:40   5              DIRECT EXAMINATION

6  BY MR. LU:

7  Q.  Good afternoon, Mr. Lawry.  My name is Terry Lu.  I'm the

8  attorney for the Wexford defendants in this case.  Can you

9  please state your name for the record?

03:20:50  10  A.  Scott Lawry, L-a-w-r-y.

11  Q.  Okay.  Mr. Lawry, are you currently employed?

12  A.  I am at the Sheridan Correctional Center for the Illinois

13  Department of Corrections.

14  Q.  Okay.  And what is your job title?

03:21:04  15  A.  Correctional counselor.

16  Q.  Okay.  How long have you been a correctional counselor at

17  Sheridan?

18  A.  Twelve years.

19         THE COURT:  Mr. Lu, let me just break in one for one

03:21:19  20  second.

21         Hi, Mr. Lawry.  It's Judge Ellis.  I just wanted to

22  thank you for your patience.

23         THE WITNESS:  Oh, no problem.

24         THE COURT:  I know we've had a little technical

03:21:28  25  difficulties in getting everybody hooked up the way that they

1  needed to get hooked up.

2  THE WITNESS:  Okay.

3  THE COURT:  So I appreciate your patience and

4  willingness to testify here today.

03:21:36  5  THE WITNESS:  No problem.

6  THE COURT:  Go ahead, Mr. Lu.

7  BY MR. LU:

8  Q.  My thanks as well, Mr. Lawry.

9  A.  Yep.

03:21:43  10  Q.  What are your responsibilities as a correctional counselor?

11  A.  Basically as an intermediary for inmates if they have any

12  questions, concerns, or problems dealing with IDOC matters.

13  Q.  Okay.  Are you familiar with the grievance process that's

14  available to IDOC inmates?

03:22:03  15  A.  I am.

16  Q.  Okay.  Are you familiar with the deadlines that are part of

17  that process?

18  A.  I am.

19  Q.  Okay.  I'm hoping you have a document in front of you

03:22:14  20  marked Exhibit B?

21  A.  Exhibit B?  Yes, I do.

22  Q.  Perfect.  Okay.  Do you recognize this type of document,

23  Mr. Lawry?

24  A.  I do.

03:22:38  25  Q.  Okay.  What is this type of document?

1    A.  It is a receipt that the inmate signs every time they go

2    through an orientation, usually when they first arrive at a

3    different institution.

4    Q.  Okay.  Do you recognize all three pages of Exhibit B as an

03:23:00    5    offender orientation receipt?

6    A.  I do.

7    Q.  Okay.  And what does this document indicate?

8    A.  It indicates all inmates, when they go through orientation,

9    sign that they have participated in the orientation process and

03:23:26    10   received an offender handbook during that orientation process.

11   Q.  Okay.  Turning your attention to the first page of Exhibit

12   B, does this form indicate that plaintiff went through

13   orientation at Stateville and received an offender handbook?

14   A.  It does.

03:23:43    15   Q.  Okay.  Turning to page 2, does this form indicate that

16   plaintiff went through orientation at Logan Correctional Center

17   and received an offender handbook?

18   A.  Yes, sir.

19   Q.  Okay.  Turning to page 3, does this form indicate plaintiff

03:24:00    20   went through orientation at Sheridan Correctional Center and

21   received an offender handbook?

22   A.  Yes, sir.

23   Q.  Does your signature appear on this page?

24   A.  It does right under the inmate's signature.

03:24:10    25   Q.  Okay.  Above the line labeled "witness name"?

1  A.  Correct.

2  Q.  And did you witness Mr. Hollingsworth sign this form?

3  A.  I did.

4  Q.  Okay.  Did Mr. Hollingsworth go through orientation at

03:24:31  5  Sheridan?

6  A.  He did.

7  Q.  Okay.  How do you know that?

8  A.  Basically when I picked up -- what we do is go through the

9  orientation process, and this form that he was signing or that

03:24:43  10  he signed would have been picked up by myself the day of

11  orientation after he signed it.

12  Q.  Okay.  Would you have been involved in the orientation

13  program or the orientation process?

14  A.  Yes.

03:24:55  15  Q.  Okay.  What would your involvement have been?

16  A.  I was the one that facilitated the orientation program,

17  basically going over different things to orientate new inmates

18  to Sheridan Correctional Center.

19  Q.  Okay.  Did Mr. Hollingsworth receive the offender handbook?

03:25:14  20  A.  Yes, sir.

21  Q.  And how do you know that?

22  A.  I individually passed one out to every inmate participating

23  in orientation that day, and again he would have had to have

24  signed after he received the handbook.

03:25:31  25  Q.  Okay.  What is covered during the orientation process?

03:25:59

1  A.  General guidelines.  Just a few off the top of my head,

2  good time, visitation, phone lists, visiting lists, health

3  care, grievance procedures, money.  Just general guidelines

4  that, you know, most inmates have questions about once they

5  come, you know, especially if it's their first time in prison.

6  Q.  Okay.  Would the discussion of grievances during the

7  orientation include a discussion of the steps involved in the

8  grievance process?

9  A.  I'm sorry.  The staff involved?

03:26:16

10  Q.  Would the steps -- oh, sorry.

11  A.  Oh, steps?  I'm sorry.  The steps?

12  Q.  Yes.

13  A.  Yeah, it basically just hits upon that if they have a

14  problem that, you know, they feel needs more resolution, they

03:26:33

15  can file a grievance.  It is pointed out that all the, you

16  know, time frames are in the handbook, but generally it's

17  touched upon that they have 60 days from the incident date to

18  file the grievance.

19  Q.  Okay.  Is the grievance procedure laid out in the offender

03:26:52

20  handbook?

21  A.  It is.

22  Q.  Including the applicable deadlines?

23  A.  Yes, I believe.  If I can check real quick, yeah, it says

24  it has 60 days from original incident date to file the

03:27:09

25  grievance.

1  Q.  Okay.  Mr. Lawry, I'd like to turn your attention to the

2  document in front of you that's been previously marked Exhibit

3  G.

4  A.  Okay.

03:27:38  5  Q.  Do you have that?

6  A.  I do.

7  Q.  Okay.  Do you recognize this document?

8  A.  I do.

9  Q.  Okay.  What is it?

03:27:47  10  A.  Basically, the first page is the cover sheet for the entire

11  Sheridan Correctional Center's offender handbook, and then page

12  2 -- well, I guess the second and third page are just page 47

13  and page 48 out of said handbook.

14  Q.  Okay.  Are page 2 and page 3 of Exhibit G the sections that

03:28:15  15  discuss the grievance process?

16  A.  Yes, sir.

17  Q.  Okay.  Are there any other sections of the handbook that

18  discuss the grievance process?

19  A.  I do not believe so.

03:28:25  20  Q.  Okay.  Then the steps are covered within these two pages of

21  the offender handbook?

22  A.  They are.

23  Q.  As well as the 60-day initial filing deadline?

24  A.  Correct.

03:28:43  25  Q.  Okay.  The grievance steps reflected in this handbook, have

1    they been the same since 2012?

2    A.  Yes, sir.

3    Q.  Okay.  What about the 60-day deadline for initial filing?

4    Has that been in place since 2012?

03:29:05    5    A.  Yes, sir.

6    Q.  Do you know how far back those steps and the 60-day

7    deadline have been in place?

8    A.  At least since 2004 when I first became a counselor.

9    Q.  Okay.  Has that information been reflected in the handbook

03:29:28    10    continuously since 2012?

11    A.  Correct, yes.

12    Q.  Does the grievance procedure apply to inmates at all IDOC

13    facilities?

14    A.  It does.

03:29:43    15    Q.  And what about the 60-day initial filing deadline?  Does

16    that apply to inmates at all IDOC facilities?

17    A.  Yes, sir.

18    Q.  If an inmate has questions about the grievance process, who

19    can they talk to?

03:29:56    20    A.  They can talk to security staff.  They can talk to their

21    IDOC counselor.

22    Q.  Okay.  Do you recall having any interactions with inmate

23    Artero Hollingsworth?

24    A.  About filing a grievance?

03:30:14    25    Q.  In general, do you recall having any interactions with him?

1   A.  Yeah, I had interactions with him.  Sure.  I was his

2   counselor for about a year and a half to two years.

3   Q.  Okay.  Do you recall Mr. Hollingsworth ever asking you any

4   questions about the grievance process?

03:30:31   5   A.  The process?  No.

6   Q.  Okay.  Do you recall him ever asking you any questions

7   about the applicable deadlines?

8   A.  No.

9           MR. LU:  The Wexford defendants would move to enter

03:30:50   10   Exhibit G into evidence.

11           THE COURT:  Any objection?

12           MR. ALBUKERK:  No.

13           THE COURT:  Okay.

14      (Wexford Defendants' Exhibit G received in evidence.)

03:31:02   15           MR. LU:  No further questions, Your Honor.

16           THE COURT:  All right, Mr. Albukerk.

17                    CROSS-EXAMINATION

18   BY MR. ALBUKERK:

19   Q.  Sir, did they post the deadlines for filing grievances

03:31:26   20   around the cellblocks anywhere?

21   A.  I do not believe so.

22   Q.  During orientation, do you tell the prisoners, you know,

23   instruct them how it is that they're supposed to file a

24   grievance and what the deadlines are for those grievances?

03:31:47   25   A.  Basically what I would touch on is if they had a problem,

1  you know, that they feel they need more resolution for, they

2  have 60 days to file a grievance from the occurrence of

3  incident.  Then what they do is they turn it in to the

4  counselor or put it in the grievance box, and then what they

03:32:06  5  would do is wait for an answer back and then proceed from

6  there.

7  Q.  And did you tell -- it's your testimony under oath here

8  that you tell every single prisoner that?

9  A.  When they come through orientation.

03:32:21  10  Q.  So that's a yes?

11  A.  Yes, sir, yeah.

12  Q.  Okay.

13  A.  At orientation.

14  Q.  Do you have the prisoners, do you have the prisoners check

03:32:32  15  a box or anything to show that they know that specific portion

16  of the grievance procedure about the deadlines?

17  A.  No, sir.  No, sir.

18  Q.  Do you ever have shortages of materials there at the

19  prison?

03:32:52  20  A.  May I ask what you mean by "materials"?

21  Q.  Paper.  Do you have shortages of paper?  You have to print

22  these handbooks out.  How many pages are in the handbook?

23  A.  Like roughly 63 double-sided.

24  Q.  All right.  Do you hand that out to every single prisoner?

03:33:17  25  A.  Yes.

1   Q.  And how many prisoners are in the facility?

2   A.  Roughly right now about 1700.

3   Q.  That's a lot of paper, right?

4   A.  Correct.

03:33:30   5   Q.  Do you ever run out of, you know, paper to make the copies?

6   A.  Regular paper?  Sure.  Then we end up using the photocopy

7   paper and stuff.

8   Q.  Have you ever had problems making enough copies to hand out

9   to all 1700 prisoners?

03:33:49   10   A.  I shouldn't say it's -- I mean, it's just when they come

11   through orientation, but we usually have enough paper to cover

12   us for orientation paper every week.

13   Q.  Usually.

14   A.  Yeah.

03:34:07   15        MR. ALBUKERK:  Okay.  Nothing further.

16        THE COURT:  Mr. Lu?

17                  REDIRECT EXAMINATION

18   BY MR. LU:

19   Q.  Mr. Lawry, aside from the copy of the offender handbook

03:34:15   20   that each inmate receives during orientation, are there other

21   copies of the offender handbook available at the facility?

22   A.  There is one in the library, kept in the library for people

23   that might throw theirs away or if it mysteriously get lost or

24   something.  There is a copy, I believe, in the library for

03:34:36   25   inmates to look at.

1 Q. Okay. If an inmate wanted to refer to that handbook, he

2 could access it?

3 A. Yeah, he would put in a request for the library, and then a

4 pass would be generated for him to come down to the library to

03:34:51   5 satisfy what he requested down there.

6 Q. Okay. If an inmate did not receive a copy of the handbook,

7 would you ask the hand -- would you ask the inmate to sign the

8 orientation receipt?

9 A. No, because it says he's supposed to get a copy of the

03:35:10   10 handbook.

11        MR. LU: Nothing further.

12        MR. ALBUKERK: One question.

13        THE COURT: Okay.

14                    RECROSS-EXAMINATION

03:35:15   15 BY MR. ALBUKERK:

16 Q. Isn't it true that the library closed?

17 A. That the library is closed? I don't believe so. No, not

18 that I know of.

19 Q. At Sheridan Correctional Center, the library is not

03:35:32   20 currently closed?

21 A. I may -- I don't get down to the library or nothing, but I

22 don't think it is. I'm not sure. I can't honestly answer that

23 either yes or no.

24        MR. ALBUKERK: Nothing further.

03:35:43   25        THE COURT: Okay.

1          REDIRECT EXAMINATION

2     BY MR. LU:

3     Q.  I believe I asked you this already, but I just want to make

4     sure.  Mr. Lawry, if an inmate had questions about the steps in

03:35:57      5     the grievance procedure, could that inmate ask his counselor

6     for that information?

7     A.  Yes, he could.

8     Q.  And the same for the applicable deadlines within the

9     grievance procedure?

03:36:08     10     A.  Correct.

11          MR. LU:  Thank you.

12          THE COURT:  Mr. Albukerk?

13          MR. ALBUKERK:  Nothing further.

14          THE COURT:  Okay.  Mr. Lawry, I just have a few

03:36:16     15     questions.  So Exhibit G is the handbook that is given to

16     offenders when they come to Sheridan, is that correct?

17          THE WITNESS:  This is not the complete handbook.  This

18     is just the front cover and two pages out of the handbook.

19          THE COURT:  Okay.  But those two pages cover the

03:36:39     20     grievance procedures that offenders should follow, is that

21     right?

22          THE WITNESS:  Correct.

23          THE COURT:  Okay.  It covers from the bottom of page

24     47 to the middle or so of page 48, is that right?

03:37:00     25          THE WITNESS:  Yes, ma'am.

1          THE COURT:  All right.  It says that it needs to be

2     filed within 60 days of the incident or occurrence, right?

3          THE WITNESS:  Correct.

4          THE COURT:  And it then says that once a response has

03:37:15    5     been received from the ARB, the grievance can go no further

6     within the department and that legal action can be initiated,

7     is that right?

8          THE WITNESS:  Yes, the ARB is the final step as far as

9     corrections goes.

03:37:28   10          THE COURT:  Okay.  There's nothing here on pages 47

11     and 48 that detail to the offender that the offender needs to

12     specifically lay out exactly the timing of when the offender

13     became aware of what he or she is complaining about, is that

14     right?

03:38:04   15          THE WITNESS:  I'm not sure I understand the question,

16     ma'am.

17          THE COURT:  There's nothing here on pages 47 and 48

18     that says or that instructs the offender that they need to put

19     in the grievance narrative the date by which they became aware

03:38:22   20     of whatever the incident was that they're complaining about,

21     right?

22          THE WITNESS:  Well, as listed right here?

23          THE COURT:  Yeah.

24          THE WITNESS:  No.  On the grievance form, there are --

03:38:35   25     when he does fill out the grievance form, he does put his name,

1  inmate number, and incident date on the grievance form.

2          THE COURT:  Okay.  Let's see.  So I'm looking at page

3  10 of Exhibit A.  Do you have that?

4          THE WITNESS:  No.

03:38:53  5          THE COURT:  Okay.  This is the initial grievance that

6  Mr. Hollingsworth filed, and it asks for the date, his name,

7  his IDOC number, the facility, the facility where the grievance

8  issues occurred, the nature of the grievance, and he marked the

9  box "other" and said "misdiagnosis."  Then it says "brief

03:39:30  10  summary of grievance," and there is a narrative that is there.

11          THE WITNESS:  Correct.

12          THE COURT:  That's contained in there.

13          THE WITNESS:  Uh-huh.

14          THE COURT:  Okay.  In looking at this, there doesn't

03:39:52  15  appear to be any direction to the offender to ensure that

16  they've put the operative date in the narrative or somewhere

17  else.

18          Let's see.  Do you have Exhibit E in front of you?

19          THE WITNESS:  No, ma'am.

03:40:20  20          THE COURT:  Okay.  Are you familiar with the Illinois

21  Administrative Code that covers the grievance procedures?

22          THE WITNESS:  The Administrative Code?

23          THE COURT:  Yes.

24          THE WITNESS:  No, not very well.

03:40:33  25          THE COURT:  Okay.

1          MR. LU:  Your Honor, if you refer to it as DR-504(f),

2    he might have that.

3          THE COURT:  Okay.  How about DR-504(f)?  Do you have

4    that in front of you?

03:40:46    5          THE WITNESS:  No, no, I don't.

6          THE COURT:  Okay.  Would you -- when you assist

7    offenders with filling out grievance forms in your capacity as

8    a counselor, do you tell them to make sure that they put in the

9    date by which either the incident occurred or the date by which

03:41:20   10    they were aware that there was a problem in the narrative?

11          THE WITNESS:  Correct.  Yes, what I would do is tell

12    them, you know, if they have a question -- you know, say it's a

13    first-time offender or something that comes in and says:  Hey,

14    you know, can you help me fill this out?

03:41:35   15          I'd basically just tell them to, you know, write it

16    down like you would be telling it to me.  You know, on the

17    above date and time, you know, this inmate was accused of this

18    situation, whatever the narrative might entail.  But I would

19    tell them, you know, if they asked me, to always put in, you

03:41:52   20    know, the date that it happened and then to fill out the rest

21    of the narrative as to what happened.

22          THE COURT:  Okay.  So Mr. Hollingsworth didn't receive

23    assistance with this grievance, is that right, in filling it

24    out?

03:42:12   25          THE WITNESS:  No, Mr. Hollingsworth never asked me to

1    help him fill out a grievance.

2         THE COURT:  Okay.  As far as just looking at the

3    handbook anyway, there's nothing on pages 47 and 48 that

4    instructs the offender that they need to put down the date by

03:42:32    5    which they're made aware of a problem, right?

6         THE WITNESS:  No, there's not.

7         THE COURT:  All right.  Anything further?

8         MR. LU:  Nothing further, Your Honor.

9         THE COURT:  Okay.  Oh, Mr. Lawry, you're -- let's see.

03:43:05   10    You didn't or you weren't the grievance officer in this case

11    who reviewed the grievance, right?

12         THE WITNESS:  No, ma'am, I was not.

13         THE COURT:  Okay.  Anything further?

14         MR. LU:  Nothing further.

03:43:24   15         THE COURT:  All right.  Thank you, Mr. Lawry.  We

16    appreciate your patience.

17         THE WITNESS:  No problem.  Thank you.  Have a great

18    day.

19         THE COURT:  You too.

03:44:34   20       (Witness excused.)

21         THE COURT:  Okay.  Do you want argument at this point?

22         MR. LU:  Sure.

23         MR. ALBUKERK:  Sure.

24         THE COURT:  Okay.  Why don't we do this so that we can

03:44:41   25    get the record complete.  All right.  Mr. Lu, since it's

1  Wexford's burden, why don't you go first.

2        MR. LU:  Your Honor, this is a relatively

3  straightforward case.  Under the Prisoner Litigation Reform

4  Act, otherwise known as the PLRA, Mr. Hollingsworth was

03:45:24   5  required to exhaust his administrative remedies prior to filing

6  suit.  The position of the Wexford defendants is that

7  Mr. Hollingsworth failed to do so because the initial filing of

8  his grievance was untimely.

9        Mr. Hollingsworth was required to follow the grievance

03:45:40  10  procedures as set forth in the Illinois Administrative Code,

11  and those procedures require that he perform his initial filing

12  within 60 days of the incident which Mr. Hollingsworth

13  identified as the misdiagnosis of his tongue cancer.

14  Mr. Hollingsworth testified that he was informed of that cancer

03:46:01  15  diagnosis in November of 2013.  So even granting him the

16  benefit of that date, his grievance was still filed beyond the

17  60-day date, beyond 60 days after that date.

18        THE COURT:  So, Mr. Lu, though, Mr. Hollingsworth also

19  testified that he wasn't aware of the connection between the

03:46:23  20  sores on his tongue and the tongue cancer until February of

21  2014 when he spoke to the doctors in a follow-up visit with the

22  doctors at UIC.

23        MR. LU:  Yes, that was what Mr. Hollingsworth

24  testified to.  However, if you look at his fourth amended

03:46:49  25  complaint, beginning on page 3 and continuing through to

1   paragraph 28 on page 6, Mr. Hollingsworth alleges that he was

2   aware that there was some issue with his tongue, that he was

3   constantly complaining that he felt that Dr. Obaisi was not

4   fully examining his tongue, that he had lesions that he

03:47:25    5   suspected might have been herpetic and undertreated.  He put in

6   for sick call at Logan.  He requested medical care and

7   examination at Sheridan.  Then eventually in November of 2013,

8   he was told after a biopsy that his tongue was diagnosed with

9   cancer.

03:47:47    10          So the issue appears to be that Mr. Hollingsworth is

11  arguing that even though he suspected there was something wrong

12  with his tongue, that he was continually trying to have it

13  addressed, and that he eventually received a cancer diagnosis,

14  he should somehow receive the benefit of a much later date when

03:48:07    15  he claims, you know, the light bulb finally went on for him.

16          THE COURT:  Well, it's not that the light bulb went

17  on, right, Mr. Lu?  It's that a doctor told him that had these

18  been treated, potentially he could have avoided having tongue

19  cancer.  So it wasn't that a light bulb went on.  Instead, it

03:48:33    20  was the date by which he was made aware that the lack of

21  treatment that he allegedly received over time resulted in

22  tongue cancer.  According to his testimony, that was February

23  of 2014, and he filed his grievance as well in February of

24  2014.

03:48:55    25          MR. LU:  Well --

1　　　　THE COURT:  Isn't it true that the Administrative Code

2　says that a grievance shall be filed within 60 days after the

3　discovery of the incident, occurrence, or problem that gives

4　rise to the grievance?  So it's after the discovery of the

03:49:20　5　incidence, occurrence, or problem, right?  That's the operative

6　language, is that right?

7　　　　MR. LU:  That is correct, Your Honor, and the Wexford

8　defendants would argue that that information was discovered

9　when he received the cancer diagnosis in November of 2013.

03:49:36　10　　　　THE COURT:  And it further goes on to state what's in

11　the grievance form, and it says:

12　　　　"The grievance shall contain factual details regarding

13　each aspect of the offender complaint, including what happened,

14　when, where, and the name of each person who is the subject of

03:49:54　15　or who is otherwise involved in the complaint.  This provision

16　does not preclude an offender from filing a grievance when the

17　names of individuals are not known, but the offender must

18　include as much descriptive information about the individual as

19　possible."

03:50:09　20　　　　It then goes on to state:

21　　　　"The staff assistant shall be available as requested

22　by those offenders who cannot prepare their grievances unaided

23　as determined by institutional staff."

24　　　　Now, there's nothing here that I see, anyway, that

03:50:27　25　directs the offender either in the Illinois Administrative Code

1    or in the offender handbook that the offender needs to put in

2    the grievance the date by which he or she has discovered the

3    incident.  Is that correct?

4              MR. LU:  That is correct.

03:50:50    5         THE COURT:  Okay.  In this case, Mr. Lawry did not

6    assist Mr. Hollingsworth in filling out the grievance, right?

7              MR. LU:  I believe his testimony was that he was not

8    asked for assistance.

9              THE COURT:  Right.

03:51:10   10         MR. LU:  Yes.

11             THE COURT:  So he did not assist Mr. Hollingsworth, is

12   that right?

13             MR. LU:  Correct.

14             THE COURT:  Okay.  It says that the staff assistants

03:51:25   15   shall be available if requested by those offenders as

16   determined by the institutional staff, right?

17             MR. LU:  Correct.

18             THE COURT:  Okay.  If the institutional staff makes a

19   determination that the offender doesn't need help, they're not

03:51:41   20   required to offer help, right?

21             MR. LU:  I would read that language slightly

22   differently, Your Honor.  If an inmate does not request help,

23   then there's no need to provide it.

24             THE COURT:  Okay.  But it's also as determined by the

03:51:55   25   institutional staff, right?

1      MR. LU:  Correct.

2      THE COURT:  Okay.

3      MR. LU:  In light of a request, if they determine that

4  the inmate did not require assistance, they would not be forced

03:52:05  5  to provide it.

6      THE COURT:  Okay.  Mr. Hollingsworth testified that he

7  did not graduate from high school and did not obtain a GED and

8  any college class that he did take was in business.  Do you

9  remember that testimony?

03:52:26  10     MR. LU:  I do recall.

11     THE COURT:  Okay.  There was no testimony by anybody

12  at this point that when Mr. Hollingsworth received his cancer

13  diagnosis in November of 2013 that anyone connected that

14  diagnosis with the lack of treatment that he had received up to

03:52:54  15  that point.

16     MR. LU:  To the extent that Mr. Hollingsworth has

17  identified his claim as a misdiagnosis, again, the Wexford

18  defendants' position would be that that misdiagnosis was

19  addressed when he received the cancer diagnosis in November of

03:53:14  20  2013.

21     THE COURT:  Okay.  But there's nothing in the record

22  so far that I've seen by which someone connected his cancer

23  diagnosis, "someone" meaning a medical professional, connected

24  his cancer diagnosis with his lack of treatment up to that

03:53:33  25  point in November of 2013.

1          MR. LU:  The Wexford defendants would argue that in

2  using the term "misdiagnosis" it's implied that once the

3  correct diagnosis has been given the misdiagnosis must pre-date

4  that diagnosis.

03:53:55     5          THE COURT:  That's a little twisted, right?  That's a

6  little convoluted.  So my question to you was this.  There's

7  nothing in the record up to this point that Mr. Hollingsworth

8  was told by a medical professional:  Your cancer is a result of

9  the failure to treat these mouth sores that you've had for the

03:54:22   10  last over two years?

11          MR. LU:  Your Honor, I believe when you review the

12  fourth amended complaint that that is not what is being alleged

13  in this case.  It's not that a previous condition developed

14  into cancer, but it was cancer and was simply misdiagnosed.

03:54:41   15  That is the word that the plaintiff has used, and that is the

16  word that his counsel has used consistently throughout.

17          THE COURT:  And in November of 2013 when he received

18  the diagnosis of cancer, they didn't say to him:  These mouth

19  sores in your mouth all this time all the way through were

03:55:03   20  cancerous, and had they been treated we wouldn't be here.

21          Nobody said that to him in November of 2013, right?

22          MR. LU:  I am not aware one way or another whether or

23  not that information was had.

24          THE COURT:  Okay.  But that's not contained in the

03:55:22   25  record up to this point, at least in the documents that I have

1   or the testimony of Mr. Hollingsworth.

2   MR. LU:  If Your Honor turns to Exhibit A, page 11, I

3   suppose we could have asked plaintiff to read this, but he

4   didn't dispute the authenticity of this and that it was in his

03:56:26   5   handwriting.  The line beginning "the next week I saw Dr.

6   Craig" near the middle of the page, it says:

7   "The next week I saw Dr. Craig, and he performed a

8   biopsy.  The next week I went for a follow-up from getting my

9   tooth pulled, and the results were squamous carcinoma cell or,

03:56:48   10   rather, cancer.  Only then was I treated for what I had been

11   complaining about since 2012."

12   So the Wexford defendants would argue that the

13   plaintiff did connect the two.  When he received the diagnosis,

14   he believed that that is what he had been complaining about

03:57:06   15   since 2012.

16   THE COURT:  Okay.  Now, this was February 26th, 2014,

17   right?

18   MR. LU:  Correct, Your Honor.

19   THE COURT:  And it was written after he saw the

03:57:35   20   doctors at UIC, right?

21   MR. LU:  Correct.

22   THE COURT:  When the doctors were the ones, according

23   to Mr. Hollingsworth's first testimony, that connected the dots

24   for him.

03:57:48   25   MR. LU:  Correct.

1    THE COURT:  Okay.  So it certainly could be that this

2    was written in light of what the doctors from UIC told him.

3    MR. LU:  It's a possibility.  But again, to the extent

4    Mr. Hollingsworth had a tongue-related complaint since 2012 and

03:58:10    5    then was informed in November of 2013 that it was cancer, the

6    Wexford defendants would argue at that point Mr. Hollingsworth

7    became aware of what he now characterizes as a misdiagnosis.

8    THE COURT:  All right.  Anything further?

9    MR. LU:  Nothing further, Your Honor.

03:58:29    10    THE COURT:  Okay.

11    MR. LU:  Thank you.

12    THE COURT:  Mr. Albukerk?

13    MR. LU:  Oh, my apologies.

14    THE COURT:  Go ahead.

03:58:42    15    MR. LU:  Also, Your Honor, to the extent that

16    Mr. Hollingsworth now complains that he was not aware of what

17    the proper grievance procedure was or the applicable deadlines,

18    we would argue that those deadlines are reflected in the

19    offender handbook which Mr. Hollingsworth signed that he

03:59:07    20    received, that that information was covered in the orientation

21    which Mr. Hollingsworth signed a form indicating that he went

22    through, that Mr. Hollingsworth had the opportunity to request

23    that information from a counselor but failed to do so, and that

24    that information is also contained in the Illinois

03:59:25    25    Administrative Code which is publicly available.

1         Those deadlines are required.  They are mandatory and

2   not optional, and full compliance with the grievance procedures

3   as laid out in those documents is required to exhaust one's

4   administrative remedies prior to filing suit, and

03:59:47   5   Mr. Hollingsworth failed to comply with those procedures.

6         THE COURT:  Okay.  You would agree with me, Mr. Lu,

7   that if I were to find that it's the discovery rule that is

8   applicable and that it's the discovery rule that is in place as

9   laid out in the Illinois Administrative Code, then

04:00:14   10   Mr. Hollingsworth's initial grievance would have been timely

11   filed.

12         MR. LU:  To the extent that Mr. Hollingsworth did not

13   provide that information to the Administrative Review Board,

14   the grievance could not be responded to as timely.

04:00:32   15         THE COURT:  Well, there was nothing until it went up

16   to the ARB to indicate that it was untimely, isn't that

17   correct?  So it's every response up to the ARB.  So the

18   counselor's response is on page 10:

19         "Per health care at Sheridan, inmate was found to have

04:01:05   20   cancer in his mouth after a biopsy of bumps on inmate's tongue

21   were analyzed."

22         That's April of 2014.  Then it went up to the

23   grievance officer who said:

24         "Received the grievance and reviewed relevant medical

04:01:25   25   records.  The medical record does not substantiate his report

1   of having complained of mouth sores in February of 2014.

2   Subsequently, due to his medical conditions he was seen

3   frequently by a number of providers, and at none of these

4   visits was there documentation of mouth sores or the inmate

04:01:44   5   complaining of same until November of 2013 when he was

6   diagnosed."

7        Then they recommend that it be denied, and the chief

8   administrative officer's response was "I concur."  It wasn't

9   until it went to the ARB that that the ARB then says:

04:02:10   10        "Issue is 60 days old.  Issue of February 2012

11   non-compliance with DR-504."

12        So there's no indication until it gets to the ARB that

13   his initial grievance was untimely.  Had it gone back to him

14   with a notification that it was untimely, he could have amended

04:02:43   15   the grievance to indicate that he discovered it when he went to

16   the UIC visit, isn't that correct?

17        MR. LU:  That's correct, but the ARB chairperson,

18   Leslie McCarty, also testified that Mr. Hollingsworth could

19   have sent additional information and that that would have been

04:03:03   20   included in this file.

21        THE COURT:  Well, there was no indication until it

22   came back to him from the ARB that the discovery date was

23   missing, right?

24        MR. LU:  Correct.

04:03:22   25        THE COURT:  And once it came back to him from the ARB,

1    there was nothing further he could do, right?  He can't appeal

2    a decision from the ARB.  That's what Ms. McCarty said, right?

3             MR. LU:  She did say that, but she also mentioned that

4    untimeliness can be excused if the inmate provides a basis for

04:03:43    5    the untimeliness.

6             THE COURT:  Let's see what she said.

7         (Brief pause.)

8             THE COURT:  So I asked her:  Once he received your

9    response from the ARB, he could not go any further, is that

04:04:22   10    right?

11             Then she said:  Correct, he could not appeal our

12    decision.

13             MR. LU:  Well, while it is technically true that

14    providing additional information to the ARB would not be an

04:04:37   15    appeal, it would be a request to include additional information

16    within their review.

17             THE COURT:  Right.  But there is a box on this form

18    which says "additional information required," right?  It says

19    in the last box there:

04:04:57   20             "Unable to determine the nature of grievance from

21    correspondence.  Submit additional specific information.

22    Please return the attached grievance or correspondence with the

23    additional information requested to" -- and then it gives the

24    address.

04:05:11   25             There's nothing in that.  None of those boxes are

1  marked.

2          MR. LU:  Correct.  The Wexford defendants would argue

3  that none of the boxes are applicable.

4          THE COURT:  Well, certainly there is a way.  This is

04:05:33  5  the ARB, right?

6          MR. LU:  Correct.

7          THE COURT:  If the ARB wanted additional information,

8  the ARB certainly could have requested that additional

9  information, right?

04:05:45  10          MR. LU:  Correct.

11          THE COURT:  And there is nothing on here to indicate

12  that the ARB wanted additional information or was requesting

13  additional information, isn't that correct?

14          MR. LU:  Correct.

04:05:59  15          THE COURT:  Okay.  It says or what is marked says:

16          "Not submitted in the time frame outlined in

17  Department Rule 504.  Therefore, this issue will not be

18  addressed further."

19          And that's actually underlined, is that correct?

04:06:20  20          MR. LU:  That's correct.

21          THE COURT:  So there's nothing here to indicate to

22  Mr. Hollingsworth that they couldn't determine the date by

23  which the 60-day clock needs to start and that he needed to

24  provide that information, right?

04:06:35  25          MR. LU:  That is correct, but this form also indicates

1   that he was being told his grievance was deemed untimely.

2           THE COURT:  And it says that this issue will not be

3   addressed further, and that's underlined, right?

4           MR. LU:  That is correct.

04:06:51   5           THE COURT:  And there's nothing here to indicate to

6   him that he should or could provide additional information, is

7   that correct?

8           MR. LU:  That is correct.  But if Your Honor turns to

9   Exhibit E, page 22, subsection (a), it reads --

04:07:12   10          THE COURT:  Hold on.  Let me get there.

11          MR. LU:  Okay.  Beginning with the line "a grievance

12  shall be filed," page 2, subsection (a).

13          THE COURT:  Okay.

14          MR. LU:  The relevant section reads:

04:07:36   15          "A grievance shall be filed within 60 days after the

16  discovery of the incident, occurrence, or problem that gives

17  rise to the grievance.  However, if an offender can demonstrate

18  that a grievance was not timely filed for good cause, the

19  grievance shall be considered."

04:07:50   20          THE COURT:  Right.  It doesn't say, right?  There's

21  nothing here to indicate that he had the opportunity to

22  demonstrate that his grievance was timely filed, right?  So it

23  says that if the offender can demonstrate that a grievance was

24  not timely filed for good cause, then you can consider the

04:08:23   25  grievance.  That's not the case here.  He's not saying:  My

1    grievance was untimely filed.

2         He's actually saying:  It was filed within 60 days
3    after the discovery of the incident, which was when I met with
4    the doctors at UIC and they told me that had I received
04:08:44
5    treatment for these mouth sores that I would not have had
6    cancer and that it was a misdiagnosis in terms of treating
7    these mouth sores.

8         MR. LU:  If Mr. Hollingsworth disagreed with the
9    characterization of his grievance as untimely, he could have
04:09:04
10   provided additional information to the ARB.  If you look at
11   Exhibit A, there are a number of handwritten correspondence
12   provided by Mr. Hollingsworth to the ARB, and he could have
13   addressed this potential issue in much the same manner.

14        THE COURT:  So again in the handbook it says:

04:09:40
15        "Once a response has been received from the ARB, the
16   grievance can go no further within the department and legal
17   action can be initiated."

18        That's in the handbook.  In the response that he
19   received, it was specifically underlined that this issue will
04:09:57
20   not be further addressed, isn't that right?

21        MR. LU:  That is correct, but it must be taken in
22   light of the testimony that the exhaustion of administrative
23   remedies requires full compliance with the grievance procedure
24   which Leslie McCarty testified Mr. Hollingsworth had failed to
04:10:40
25   do.

1    THE COURT:  According to her reading of his grievance.

2    MR. LU:  Correct, as the ARB chairperson who reviews

3    grievances.

4    THE COURT:  Okay.  Anything further?

04:10:51    5    MR. LU:  Nothing further.

6    THE COURT:  All right.  Mr. Albukerk?

7    MR. ALBUKERK:  Judge, just very briefly, I'd like to

8    point out that what Mr. Hollingsworth has been telling us here

9    makes sense ultimately because, you know, Dr. Caradine, he's

04:11:21    10    the dentist who ultimately found there might be something wrong

11    and referred it to the specialist.  He's not going to sit there

12    and point through the door at Dr. Bautista who's walking by at

13    that moment and he's not going to say:  Yeah, Dr. Bautista, he

14    should have caught this.  You know, I can't believe it took

04:11:46    15    this long to get here.

16    He's just not going to do that to a guy he's got to

17    work with all the time and is bumping into all the time.  You

18    know, Dr. Caradine did a great job.  He saved my client's life.

19    THE COURT:  And are you aware whether Dr. Caradine,

04:12:01    20    the dentist, had access to Mr. Hollingsworth's full medical

21    record?

22    MR. ALBUKERK:  I don't know that one way or the other.

23    There's no way for me to know that.  But it just makes sense in

24    a general sort of scope way that Dr. Caradine isn't going to be

04:12:22    25    the person to talk about, you know, who's at fault and all

1　that.  It makes sense that UIC doctors who aren't anywhere near

2　the prison and who don't have to interact with Dr. Bautista or

3　Dr. Obaisi, if anyone is going to say, you know, those are

4　going to be the doctors who are going to, you know, kind of

04:12:42　5　connect the dots.  That is what happened in this case.  You

6　heard my client's testimony, and I believe he's impeached on

7　that point, Judge.

8　Your Honor has already covered many of the points that

9　I would make, so I'm not going to belabor those points.  I

04:12:55　10　would point out that the witnesses for the state regarding

11　whether or not the witness -- whether or not the grievance

12　handbook is handed out, you know, he testified as well:  Yeah,

13　we hand it out to everybody, and usually we have enough paper.

14　Usually you have enough paper?  Usually you have

04:13:17　15　enough paper means that sometimes you don't have enough paper.

16　So it's amazing to me that these issues come up because

17　obviously we have these Pavey hearings maybe not all the time

18　but pretty often.  These issues come up quite a bit.  You would

19　think that they'd have a much stronger record showing, you

04:13:35　20　know, a checkmark or something saying, yeah, you've been told

21　that you need to, you know, do this within 60 days.

22　But that's really not our issue.  Our issue is that my

23　client filed his grievance, you know, when he knew, when he

24　found out.  Your Honor has already said that you understand

04:13:49　25　that, so we're not going to belabor that point.

1    As far as, you know, some of the other things opposing

2  counsel said, I believe that it's an incorrect characterization

3  of the complaint to say that my client just knew automatically

4  that mouth sores equal cancer. That's not what the complaint

04:14:09    5  says. You know, he saw doctors, and these doctors didn't lead

6  him to believe that these were a big deal. They said: Ah,

7  show it to me later. I'll take a look now.

8    Anyway, all that is going to come out, we hope, in a

9  trial or through discovery. Your Honor, we would simply hope

04:14:30   10  and would ask that you would deny the defendants' Pavey hearing

11  or motion at this time. Thank you.

12    THE COURT: Okay. Anything further, Mr. Lu?

13    MR. LU: The Wexford defendants would ask the Court to

14  dismiss the matter with prejudice.

04:14:44   15    THE COURT: All right. We have not had any briefing

16  then on the motion to dismiss with regard to the exhaustion

17  issue because we did, you know, need a hearing beforehand, so

18  would Mr. Hollingsworth want to respond in writing to the

19  motion to dismiss and then allow the Wexford defendants to

04:15:23   20  reply, or do you want to base your response on the arguments

21  that were made here and the reply such that then I can just

22  issue a ruling?

23    MR. ALBUKERK: Judge, we would base it on this

24  hearing, the arguments that were made in this hearing. I think

04:15:44   25  that's probably the most expeditious way to proceed.

1                    THE COURT:  Mr. Lu, what would you like?

2                    MR. LU:  We wouldn't object to that.

3                    THE COURT:  Okay.  Just let me go back and look.  Was

4          the motion to dismiss based solely on exhaustion?  I know that

04:16:06  5    we had the nurse as well.  Let's see.

6                    MR. ALBUKERK:  That's true.  Could I have a moment?

7                    THE COURT:  Sure.

8               (Discussion off the record.)

9                    MR. LU:  I don't know, but I'll bring that to the

04:16:49  10   Court's attention.

11                   THE COURT:  All right.  So what we've got as

12         defendants Wexford, Dr. Bautista, Dr. Obaisi, and then the

13         nurse.

14                   MR. LU:  Your Honor, there was -- my apologies.  There

04:17:04  15   was a stipulation that the nurse is not referenced in the

16         grievance that Mr. Hollingsworth filed.

17                   THE COURT:  Okay.

18                   MR. LU:  So Wexford would in the alternative request

19         that the nurse be dismissed with prejudice.  She was not given

04:17:21  20   notice that her conduct was at issue or that it was being

21         grieved prior to the filing of this lawsuit.

22                   THE COURT:  Okay.  Mr. Albukerk, do you have a

23         response to that?

24                   MR. ALBUKERK:  Judge, that's correct.  That is a

04:17:38  25   correct recitation of the filings and the grievance as we

1   understood it, and that's the reason why we agreed to it in the

2   requests to admit.

3           THE COURT:  All right.  So I'm going to then dismiss

4   defendant Maionchi.

04:18:04   5           MR. ALBUKERK:  Gail Maionchi, is that it?

6           THE COURT:  Okay.  So it's M-a-i-o-n-c-h-i.

7           MR. ALBUKERK:  Right.

8           THE COURT:  I will dismiss her with prejudice.  All

9   right.  Then in terms of the motion to dismiss filed by Wexford

04:18:22   10   and Dr. Obaisi, is the only issue exhaustion?

11           MR. LU:  I don't have the motion before me, Your

12   Honor.

13           THE COURT:  Here you go (indicating).

14           MR. LU:  I believe there was potentially also a

04:18:42   15   statute of limitations issue that we were asked to hold off on

16   until the Pavey hearing had occurred.

17           THE COURT:  Okay.  Let's see.  Yes, you've got a

18   statute of limitations issue with Dr. Obaisi and any treatment

19   at Logan.  So with regard to the exhaustion issue, I will issue

04:19:40   20   a written ruling on that, but why don't we set briefing on the

21   statute of limitations issue with regard to Dr. Obaisi because

22   that doesn't impact exhaustion at all.

23           MR. ALBUKERK:  Sure.

24           THE COURT:  So, Mr. Albukerk, when would you like to

04:20:31   25   file a response?

1    MR. ALBUKERK:  Three weeks?

2    THE COURT:  Sure, that's fine.

3    MR. ALBUKERK:  Is three weeks all right for a

4  response?

04:20:40  5    THE COURT:  Sure.

6    MR. LU:  The Wexford defendants would request two

7  weeks to reply.

8    THE COURT:  Okay.  So let's see.  So your response,

9  Mr. Albukerk, would be April 12th.  The defendants' reply would

04:21:05 10  be April 26th.  Then we'll set June 20th as the ruling date on

11  the motion to dismiss.  Why don't I have you come back.

12    (Discussion off the record.)

13    THE COURT:  Why don't I have you come back April 12th

14  at 9:30 for a ruling on the Pavey exhaustion issue.

04:23:32 15    MR. LU:  Your Honor, what was the June 20th date you

16  mentioned for?

17    THE COURT:  That is for ruling on the motion to

18  dismiss the statute of limitations issue.

19    MR. LU:  Oh, okay.

04:23:43 20    MR. ALBUKERK:  Judge, that ruling will be by mail, or

21  do you want us to come to court on April 12th?

22    THE COURT:  Why don't you come to court on April the

23  12th.

24    MR. ALBUKERK:  Okay.

04:24:02 25    THE COURT:  Okay.  I think that takes care of

1    everything.  Is there anything else we need to deal with?

2         MR. ALBUKERK:  I was just looking at my calendar to

3    make sure I could.

4         THE COURT:  Oh, I don't know what I was thinking.  The

04:24:22    5    12th is not going to work.  Come back on the 18th.

6         MR. LU:  Same time, 9:30?

7         THE COURT:  9:30.

8         MR. ALBUKERK:  Judge, how's the 19th or the 20th

9    looking on your calendar, if I might ask?

04:25:07    10        THE COURT:  Sure, you can come the 19th at 9:30.

11        MR. ALBUKERK:  That would be a lot better.  Thanks.

12        THE COURT:  Sure.

13        MR. LU:  Will that also be the new ruling date on the

14   motion to dismiss for exhaustion?

04:25:25    15        THE COURT:  Yes, yes.  Okay.  Anything else we need to

16   take care of?

17        MR. LU:  I don't believe so.

18        MR. ALBUKERK:  I think that's it.

19        THE COURT:  All right.

04:25:41    20        MR. ALBUKERK:  Thank you so much, Judge.

21        THE COURT:  Okay.  You're welcome.

22        Thank you, officers.  I appreciate it.

23        MR. LU:  Thank you, Your Honor.

24        THE COURT:  Oh, you're welcome.

25        (Proceedings concluded.)

1      C E R T I F I C A T E

2          I, Patrick J. Mullen, do hereby certify that the

3  foregoing is a complete, true, and accurate transcript of the

4  proceedings had in the above-entitled case before the Honorable

5  SARA L. ELLIS, one of the judges of said Court, at Chicago,

6  Illinois, on March 22, 2017.

7

8                          */s/ Patrick J. Mullen*
                           Official Court Reporter
9                          United States District Court
                           Northern District of Illinois
10                         Eastern Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25